**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard A. LEONARD,
Defendant-Appellant.**

**No. 78–5744.**

United States Court of Appeals,
Fifth Circuit.

Jan. 15, 1980.

Thomas M. West (Court-Appointed), Frank L. Derrickson, Atlanta, Ga., for defendant-appellant.

Julie E. Carnes, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before GODBOLD, RONEY and FRANK M. JOHNSON, Jr., Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

Richard A. Leonard was convicted of conspiracy to murder John Charles Widener, a fellow prisoner in the Atlanta Federal Peni-

tentiary. He was also convicted of first degree murder and of conveying a weapon inside the prison. He was sentenced to serve a life sentence for conspiracy to commit murder, a life sentence for murder, and ten years for conveying the weapon.

Prior to trial, Leonard filed notice pursuant to Federal Rule of Criminal Procedure 12.2(b) that he intended to rely on a defense of insanity and that he intended to introduce expert testimony at trial relating to whether defendant possessed the mental state required before one can be convicted for the offense of murder or conspiracy to murder. After this motion and in response to a Government motion, made pursuant to Rule 12.2(c), the district court ordered Leonard to undergo an examination by a psychiatrist. Subsequent to the examination but before trial, however, defendant stipulated to his mental competency at the time of the alleged offenses and waived the issue. At trial the prosecution cross-examined Leonard as to the statements made by him to the prosecution psychiatrist.[1]

On appeal, defendant raises several issues besides the one involving Rule 12. These concern the defendant's motion for continuance, his request for a mental competency hearing [to determine competency to stand trial] and the court's denial thereof, his

---

1. The following is a portion of the cross-examination of the defendant by Government counsel:

Q And you testified that you followed them as they went down toward the ramp and step area, with Joe-Joe hitting away, was that your testimony?

A I testified that he stabbed J.C. somewhere in the chest and J.C. bent over and spun around and started running and he ran out into—you got the ramp on this side and you got the walkway on this side and Joe-Joe was trying to hit him. J.C. started running and I stayed there I guess—I don't have a recollection of a time I stood there but maybe a minute, five, ten minutes, fifteen seconds, but I went on out and when I got out they was halfway down what you call that walkway, you know. I stood a little bit down from the safety building and it was just like a shock, you know, just—I don't know what you call it, you know. I don't know what to do really.

Q Your recollection of all this is fairly detailed today, isn't it?

A Well, I was there.

Q Do you recall being interviewed by a psychiatrist named Dr. Bachus on September 26, 1978?

A Yes, ma'am.

Q Do you recall him asking you, Mr. Leonard, what happened and do you recall answering "I don't know what happened. A dark cloud just seemed to come down over me"?

A Yes, ma'am.

Q Do you recall him asking you to develop what you meant and do you recall answering "I saw Widener and Williams struggling. Williams ran toward him and grabbed Leonard," you.

A Yes, ma'am.

Q That you recalled that next you pushed Williams away and then a dark shadow came over you and the next thing you knew Williams was pulling on you.

A Yes, ma'am.

Q A dark shadow came over you. The shadow lifted and it was "as if I opened my eyes and my last recollection was seeing Widener coming after me with a hatchet in his hand. After the shadow lifted, I was aware that I was still in the prison yard, was bleeding, had blood all over me. So I knew something had happened." Do you recall stating that answer?

A Yes, ma'am.

Q That is not quite the same thing you testified today, is it?

A No, ma'am.

Q Has your recollection gotten a lot better in the last few weeks—

A No, ma'am.

Q —than when you talked to the doctor?

A No, ma'am.

Q You lied to the doctor then?

A Yes, ma'am.

Q You lied when you told him a dark cloud had come over you?

A Yes, ma'am.

Q You lied when you told him Mr. Widener was coming after you with a hatchet?

MR. DERRICKSON: Your Honor, he has answered. She has been over this and he has answered. He has admitted he made those statements. It seems to me that is sufficient.

THE COURT: Well, she is entitled to determine which is correct. Ask him which is correct.

MR. DERRICKSON: Well, she already asked him and he answered.

THE COURT: She asked him once. She is asking him about another fact now but don't belabor—

MISS CARNES: Yes, sir.

Q And you also lied when you said Williams had come toward you and grabbed you, is that correct?

A Yes, ma'am.

Q Because your testimony today is actually you went down and grabbed him away.

A Yes, ma'am.

motion to exclude evidence of a serological examination, the defendant's access to witnesses, the abbreviated "Allen" charge given the jury and a portion of instructions given the jury. Because we find it necessary to reverse on the basis of the violation of Rule 12, and absent the likelihood of reoccurrence of these matters upon retrial, we do not reach these other issues.

Rule 12.2(b) requires a defendant to give notice prior to trial of his intention to rely on the defense of insanity. Subdivision "c" of this rule gives the trial court authority upon motion of the Government to order the defendant to submit to an examination by a psychiatrist designated by the court. Subdivision "c" also provides:

> No statement made by the accused in the course of any examination provided for by this rule, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.

 On its face, Rule 12.2(c) precludes the use upon the issue of guilt of statements made by Leonard in the course of the court-ordered psychiatric examination. The rule reflects a clear congressional intent that such statements not be used in a proceeding on the issue of guilt, but rather that they be used solely on the issue of sanity.[2] As the legislative history makes clear, the purpose of Rule 12.2(c) is to secure the defendant's Fifth Amendment right against self-incrimination. See Historical Note, following 18 U.S.C. Rule 12.2. Because sanity at the time of the commission of the alleged offense bears heavily on the issue of guilt, it implicates Fifth Amendment concerns. Thus, there is a sharp distinction between the use of the defendant's statements made during a court-ordered psychiatric examination on the issue of sanity and the use, before the "fact finders" (here a jury), of incriminating statements made during such psychiatric examination on the issue of guilt and before guilt had been determined. See Gibson v. Zahradnick, 581 F.2d 75, 78 (4th Cir. 1978), cert. denied, 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1979); United States v. Bennett, 148 U.S.App.D.C. 364, 370–72, 460 F.2d 872, 878–80 (D.C.Cir.1972). Therefore, central to the court's authority to order a defendant to submit to a psychiatric examination is what we believe to be a clear understanding that the function of statements obtained during the examination is limited to the sanity issue.[3]

There is another obvious rationale behind the rule. Both the Government and the defendant may need the assistance of expert testimony on the issue of sanity. In many cases, psychiatrists would not be able to obtain reliable testimony unless they were free to inquire into the prior conduct of the defendant, including his participation in the criminal activity with which he is charged. Moreover, the psychiatric inquiry cannot succeed unless the defendant cooper-

2. Whether these statements are admissible in a separate determination for sentencing purposes once guilt has been determined need not be decided in this case. Cf. Smith v. Estelle, 602 F.2d 694 (5th Cir. 1979) (defendant may not be compelled to speak to a psychiatrist for the purpose of determining dangerousness when psychiatrist can use defendant's statements against him at the sentencing phase of a capital trial). Nor do we discuss the use of a defendant's statements at a separate determination on the issue of sanity.

3. A defendant can be barred from raising the issue of insanity as a defense if he did not submit to an examination by the court-designated psychiatrist. See Smith v. Estelle, supra, at 704. This Circuit has found that empowering the court to order a psychiatric examination concerning the insanity defense does not violate per se the defendant's rights under the Fifth Amendment. See United States v. Cohen, 530 F.2d 43, 47 (5th Cir.), cert. denied, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976). The holding in Cohen rested on the premise that, if a defendant raises insanity as a defense and introduces psychiatric testimony, "the government will seldom have a satisfactory method of meeting defendant's proof on the issue of sanity except by the testimony of a psychiatrist it selects . . . who has had the opportunity to form a reliable opinion by examining the accused." Id. at 48. More importantly, however, the court recognized that eliciting statements at a compulsory examination is not unconstitutional per se because any statement about the offense itself could be suppressed. Id. at 47.

ates; a defendant's mental condition would not be discovered in many instances unless the psychiatrist can engage in a candid conversation with the defendant about it. Therefore, it may be appropriate and even in some cases necessary for the psychiatrist, *when testifying on the issue of sanity*, to disclose the criminal activity related to him by the defendant.

Thus, drawing on the language of the rule and the reasoning behind it, Leonard's statements introduced at trial for impeachment purposes were inadmissible under Rule 12.2(c). To secure the reliability of the psychiatric interview as well as to prevent the infringement of the defendant's Fifth Amendment rights, Leonard's right to a competency determination to prove insanity cannot be conditioned on allowing the statements obtained at such a determination to be used by the Government for evidence on issues other than sanity. The legislative history of the rule supports this conclusion. The Conference Committee Notes, the Senate Debate, and the House Debate all indicate that facts related in a psychiatric examination should not be admissible on the issue of guilt and that the only purpose for which the statements can be admitted is to determine the issue of sanity. *See* Historical Note, *supra* ; 121 Cong.Rec. 25843, 25986 (1975).[4]

■ The Government urges us to adopt case law developed under 18 U.S.C. § 4244 as binding on the interpretation of Rule 12.2. Section 4244 permits the court to order a psychiatric examination in cases where there is a question concerning the competency to stand trial. Like Rule 12.2, Section 4244 precludes the admission into

evidence on the issue of guilt any statement made by the defendant.[5] We reject the assertion that the similarity in language in the two provisions demands application of precedent developed under Section 4244 to Rule 12.2 for several reasons.

To support its contention, the Government relies principally on *United States v. Castenada*, 555 F.2d 605 (7th Cir.), *cert. denied*, 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977). In that case, defendant appealed his conviction on the ground that 18 U.S.C. § 4244 precludes the admission into evidence on the issue of guilt of any statement made by the defendant. The Seventh Circuit held that Section 4244 does not bar the use of statements by the accused for purposes of impeachment. The court relied on the "*Miranda* exception to impeachment" to support the distinction between precluding the admission of evidence on the issue of guilt in the case in chief and admitting otherwise inadmissible evidence for purposes of impeachment. *Id.* at 609. *See Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1970).

We do not find the reasoning applied in *Castenada* persuasive on the issue presented here.[6] First, *Castenada* involved the construction of a separate statute, 18 U.S.C. § 4244, and not a Federal Rule of Criminal Procedure. Legislative history does not indicate that existing case law developed under Section 4244 was enacted into the rule; instead it emphasizes that the two provisions are to be treated separately. *See* Notes of Advisory Committee on Rules, Historical Note, *supra*.

---

**4.** Both the Advisory Committee's Notes and the Report of the House Judiciary Committee specifically contemplate a separate determination of the issue of sanity. *See* Historical Note, *supra*. This is because use of the defendant's statements elicited at a psychiatric examination solely at a hearing to determine sanity encounters no self-incrimination objection under the rule.

**5.** 18 U.S.C. § 4244 provides in applicable part: No statement made by the accused in the course of any examination into his sanity or

mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.

**6.** Although the defendant in *Castenada*, unlike the situation in the case before us, opened the door on direct examination to the content of the statements made during his competency examination, we do not rely on that distinction.

Additionally, there is a reasoned basis to treat the prophylactic rule concerning a competency hearing less stringently than that concerning the insanity defense. Unlike an examination to ascertain competence to stand trial, the purpose of an interview to probe sanity at the time of the commission of the charged offense is to obtain from the accused information bearing directly on his guilt. *See United States v. Malcolm,* 475 F.2d 420, 425 (9th Cir. 1973). Insanity at the time of the offense charged involves an intent question that eventually may negate a basic element of the offense. Statements from the defendant are most critical to a determination of the intent question that is basic to the issue of mental capacity to commit a crime. Because such statements are focused on the time of the commission of the crime, there is a greater likelihood of soliciting statements that breach a defendant's Fifth Amendment rights. On the other hand, determining the defendant's capacity to stand trial under Section 4244 does not primarily concern his mental state at the time of the commission of the alleged crime but concerns his mental condition at the time of trial.

We conclude that a firm rule that prevents the prosecution from relying on statements of a defendant given during the course of a compelled psychiatric examination for impeachment purposes not only protects the integrity and reliability of the psychiatric interview but also prevents infringement on the defendant's Fifth Amendment rights. We, therefore, give effect to the apparent command of Rule 12.-2(c). Accordingly, we REVERSE the ruling of the trial court and REMAND for a new trial.